# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILMINGTON TRUST,<br>NATIONAL ASSOCIATION, as<br>Securities Intermediary, | §<br>§<br>§<br>§ | No. 126, 2022 |
| | §<br>§ | Court Below: Superior Court |
| Defendants/Counterclaim<br>Plaintiff Below, | §<br>§ | of the State of Delaware |
| Appellant/Cross-Appellee, | §<br>§ | C.A. Nos: N18C-07-289 |
| | § | N17C-08-331 |
| v. | §<br>§ | |
| SUN LIFE ASSURANCE<br>COMPANY OF CANADA, | §<br>§<br>§<br>§ | |
| Plaintiff/Counterclaim<br>Defendant Below,<br>Appellee/Cross-Appellant. | §<br>§<br>§<br>§<br>§<br>§ | |

Submitted: January 11, 2023
Decided: March 20, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, and Samuel D. Cordle, Esquire ABRAMS & BAYLISS LLP, Wilmington, Delaware; Harry S. Davis, Esquire (*argued*), and Robert E. Griffin, Esquire, SCHULTE ROTH & ZABEL LLP, New York, New York, *for Appellant Wilmington Trust, National Association*.

Gregory F. Fischer, Esquire, COZEN O'CONNOR, Wilmington, Delaware; Joseph M. Kelleher, Esquire, (*argued*) and Brian D. Burack, Esquire, COZEN O'CONNOR, Philadelphia, Pennsylvania, *for Appellee Sun Life Assurance Company of Canada*.

**TRAYNOR**, Justice:

In 2011, in an opinion now known simply as "*Price Dawe*,"[1] this Court described the historical background against which a type of life insurance policy known as "stranger originated life insurance"—or "STOLI" for short—was developed. We need not rehearse that history here. It is enough to recall *Price Dawe*'s core holding: because STOLI policies are created by third parties "for the benefit of those who have no relationship to the [person whose life is] insured"[2] they lack an insurable interest and are considered illegal wagers on human life. As such, STOLI policies are, according to *Price Dawe* and the majority of courts that have considered the question, void *ab initio* as against public policy.

This conclusion and, more generally, the phenomenon of void *ab initio* contracts have spawned a host of thorny questions regarding the appropriate remedial response to the identification of a policy as STOLI. These questions are particularly difficult when the policy has been in force for several years during which the owners of the policy have paid sizable premiums and beneficial ownership of the policy has changed hands, in some cases several times. Indeed, over the past two years, this Court has confronted such questions on three occasions.

---

[1] *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex tel. Christiana Bank & Trust Co.*, 28 A.3d 1059 (Del. 2011) ("*Price Dawe*").
[2] *Id*. at 1070.

2

In *Lavastone Capital LLC v. Estate of Berland*,[3] we answered three questions certified to us by the United States District Court for the District of Delaware, all of which concerned the extent to which and under what circumstances an estate may recover a STOLI policy's death benefit. Six months later, in *Wells Fargo Bank, N.A. v. Estate of Malkin*,[4] we once again answered certified questions, this time from the United States Court of Appeals for the Eleventh Circuit. The questions from the Eleventh Circuit focused on the rights of a third-party purchaser of a STOLI policy who was being sued under 18 *Del. C.* §2704(b) to raise certain defenses in an effort to retain a previously paid death benefit or, alternatively, to seek recovery of premiums it paid on the void policy. Our answers clarified, among other things, that STOLI policies are void *ab initio* and can never be enforced.

Three months after *Estate of Malkin*, we decided *Geronta Funding v. Brighthouse Life Ins. Co.*[5] (referred to by the parties in this case as "*Seck*," which was the insured's surname), which was not a STOLI case but instead involved a life insurance policy that was declared void *ab initio* because its purported insured was a fictitious individual. We were asked to determine whether premiums paid on insurance policies declared void *ab initio* for lack of an insurable interest should be returned to the payor of the premiums. We ultimately determined that the question

---

[3] 266 A.3d 964 (Del. 2021).
[4] 278 A.3d 53 (Del. 2022).
[5] 284 A.3d 47 (Del. 2022) ("*Seck*").

whether premiums should be returned to a premium payor who presents a viable legal theory, such as unjust enrichment, calls for "a fault-based analysis as framed by [Section 198 of] the Restatement [(Second) of Contracts]."[6]

In this case, Wilmington Trust National Association, acting as securities intermediary for Viva Capital Trust, was the downstream purchaser of two high-value life insurance policies issued by Sun Life Assurance Company of Canada. After the insureds died, Sun Life, believing that the policies were STOLI policies that lacked an insurable interest, filed suit in the Superior Court, seeking declaratory judgments that the policies were void *ab initio*. Sun Life sought to avoid paying the death benefits and to retain the premiums that had been paid on the policies.

Wilmington Trust asserted affirmative defenses and counterclaims, alleging that Sun Life had flagged the policies as potential STOLI years before Wilmington Trust acquired them. Wilmington Trust sought to obtain the death benefits or, in the alternative, a refund of all the premiums that it and former owners of the policies had paid on the policies. Sun Life countered that allowing Wilmington Trust to recover the death benefits would constitute enforcing an illegal STOLI policy and that Wilmington Trust could not recover the premiums because, among other

---

[6] *Id*. at 50.

arguments, Wilmington Trust knew that it was buying and paying premiums on illegal STOLI policies.

In an order entered before this Court decided *Estate of Malkin* and *Seck*, the Superior Court ruled that the policies were void *ab initio* and resolved the parties' competing claims relating to the policies' death benefits and the premiums paid over the life of the policies.[7]  In short, the court denied Wilmington Trust's bid to secure the death benefits, but ordered Sun Life to reimburse, without prejudgment interest, all premiums "to the party that paid them."[8]

The court's disallowance of Wilmington Trust's death-benefit claim, accomplished in part by an earlier dismissal of Wilmington Trust's promissory-estoppel counterclaim and the striking of certain of its equitable defenses, is consistent with this Court's STOLI precedents.  But its application of an "automatic premium return" rule—that is, ordering all premiums to be returned without conducting the fault-based analysis we adopted in *Seck*—is not.  Nor is the Superior Court's denial of prejudgment interest.  Therefore, we affirm in part, reverse in part, and remand to the Superior Court for reconsideration of its ruling on Wilmington Trust's premium-return claim, including its claim for prejudgment interest.

---

[7] *Sun Life Assurance Co. of Canada v. Wilmington Trust, Nat'l Ass'n*, 2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022).
[8] *Id*. at *14.

5

I

A

In April 2005, Sun Life—a self-described "leading member[] of the life insurance industry"—distributed a memorandum to "All Agents," expressing concerns about the increased volume of STOLI in the life insurance market. Describing STOLI, "investor owned," and "lending of life" sales as "detrimental to our policyholders and procedures, as well as Sun Life Financial and the entire life insurance industry,"[9] Sun Life informed its agents that "Sun Life will not participate in these types of transactions."[10]

In early 2006, concerned about "the potential exposure Sun Life may have to Life Settlement and Investor or Stranger Owned Life Insurance Sales[,]" Sun Life initiated an analysis of its policies designed to identify Sun Life policies that "exhibit one or more 'red flag' characteristics matching known attributes or warning signs of potential IOLI[11] or S[T]OLI business."[12]

In September 2006, amid this fraught atmosphere, Sun Life issued a $10 million policy insuring the life of Bernard De Bourbon, who was then 78 years old. In December 2006, Sun Life issued a $9 million policy insuring the life of Samuel

---

[9] App. to Opening Br. at A893–94.
[10] *Id*. at A894.
[11] "IOLI" in this context stands for "investor owned life insurance."
[12] App. to Opening Br. at A909.

H. Frankel, then 73 years old. As discussed further below, Sun Life later asserted—and the Superior Court found[13]—that the De Bourbon and Frankel policies were investor-originated STOLI policies that lacked an insurable interest. It is undisputed, however, that Sun Life did not know when it issued the policies that they were STOLI.

Although neither De Bourbon nor Frankel wanted or needed life insurance, they applied for the policies upon the urging of intermediaries affiliated with a constellation of entities known generally as Life Product Clearing Program or "LPC." LPC, created in 2005 by Steven Lockwood and Martin Fleisher, originated and acquired high-face-value STOLI policies, underwritten by certain desirable insurers, including Sun Life, on the lives of handpicked seniors. Purchasing the STOLI policies as investments, LPC's goal was either to collect the death benefit or sell the policies on the secondary market for a profit. LPC employed schemes to feign compliance with insurable-interest laws and slip STOLI applications past insurers, including by having the policy issued to a trust and making it appear as though the insured paid the initial premium.

The De Bourbon and Frankel policies followed this pattern. The policies were issued to the Bernard De Bourbon Life Insurance Trust and Samuel Frankel Trust,

---

[13] Wilmington Trust did not appeal the Superior Court's determination that the policies were STOLI.

7

respectively. And notably, neither De Bourbon nor Frankel paid the initial premium.[14] Although Frankel fronted the initial premium in reliance on LPC's promise to reimburse him and pay 3% of the face value, De Bourbon lacked the funds to pay for his policy, and therefore his initial premium was fronted by an attorney with whom he had no preexisting relationship.

Shortly after the policies became effective, both were sold to LPC through sales of the trusts' beneficial interests. At least three different LPC-affiliated entities—LPC Holdings I LP, Villa Capital, and ESF QIF Trust—held the policies between 2006 and 2014. In August 2014, Wilmington Trust, as securities intermediary for Viva Capital Trust ("Viva"), acquired the De Bourbon and Frankel policies from ESF QIF Trust as part of a portfolio of 158 life insurance policies. Sun Life asserts that Viva was in the business of buying portfolios of STOLI policies at a discount and bought the De Bourbon and Frankel policies with "eyes wide open" to their insurable-interest problems.[15] Sun Life collected approximately $6.9 million in premiums on the policies from their inception;[16] of that amount, Wilmington Trust paid approximately $2.3 million in premiums on Viva's behalf after acquiring the policies in 2014.

---

[14] *Id.* at *10; App. to Answering Br. at B1618, B1621.
[15] Answering Br. at 15–21.
[16] Opening Br. at 19. *See* Answering Br. at 46 n.22.

De Bourbon died in 2017, and Frankel died in 2018. At the time of the insureds' deaths, Wilmington Trust, as securities intermediary for Viva, owned the policies. After receiving notice of De Bourbon's and Frankel's deaths, Sun Life filed complaints in the Superior Court seeking declaratory judgments that the policies were illegal STOLI policies and therefore void *ab initio*. Sun Life sought to avoid paying the death benefits and to retain the premiums that had been paid on the policies.

Wilmington Trust asserted four counterclaims: breach of contract, breach of the implied covenant of good faith and fair dealing, unfair or deceptive trade practices under Massachusetts law, and promissory estoppel. Wilmington Trust sought, among other relief, damages for breach of contract or promissory estoppel equal to the policies' death benefits or, in the alternative, a return of all premiums ever paid to Sun Life on the policies; and prejudgment and postjudgment interest. Wilmington Trust also asserted various affirmative defenses, including laches, waiver and estoppel, and unclean hands.

In support of its claims that it was entitled to recover the death benefits, Wilmington Trust alleged that in 2008, or perhaps earlier, Sun Life flagged the De Bourbon and Frankel policies as potential STOLI policies because of their association with LPC. Wilmington Trust asserted that, by December 2009 at the

latest, Sun Life had no intention of paying the death benefits on the policies. Indeed earlier in 2009, Wilmington Trust points out, Sun Life filed litigation challenging the validity of other policies linked to LPC. But instead of challenging the De Bourbon and Frankel policies at that time or otherwise speaking up about its suspicions, Sun Life approved three separate ownership/beneficiary changes, repeatedly represented that the policies were "in force" and "active" and continued collecting millions of dollars in premiums on the policies.[17]

## C

Sun Life moved to dismiss Wilmington Trust's counterclaims and to strike its affirmative defenses. The Superior Court dismissed the promissory-estoppel claim and denied the motion to dismiss with respect to the other counterclaims.[18] It observed that *Price Dawe* "stands for the general principle that there can be no contractual prohibition contesting enforceability when the agreement is void *ab initio*" but "does not, however, require dismissal of all counterclaims based on the contract."[19] The court determined that Wilmington Trust had sufficiently pleaded

---

[17] *See* App. to Opening Br. at A1465.5–A1465.22, A1465.23–A1465.50, A2270–72.

[18] *Sun Life Assurance Co. of Canada v. Wilmington Trust, Nat'l Ass'n*, 2018 WL 3805740 (Del. Super. Ct. Aug. 9, 2018) [hereinafter, *Motion to Dismiss Decision*]. The Superior Court rendered this decision in the case concerning the De Bourbon policy. It later adopted the same rulings in the Frankel litigation. Order Granting in Part and Denying in Part Pl.'s Mot. to Dismiss and Granting Pl.'s Mot. to Strike Affirmative Defenses, *Sun Life Assurance Co. of Canada v. Wilmington Trust Nat'l Ass'n*, N18C-07-289 CCLD, 2019 WL 12013248 (Del. Super. Ct. Apr. 3, 2019), Dkt. 51. After the motion to dismiss ruling in the Frankel case, the cases were consolidated for case-management purposes.

[19] *Motion to Dismiss Decision*, *supra* note 18, at *3.

its breach of contract and good-faith-and-fair-dealing counterclaims and that there were too many issues of fact relating to the unfair and deceptive trade practices claim to dismiss that claim at the pleading stage. As for the promissory-estoppel claim, the court held that if the contract were found to be valid, estoppel would not be a valid counterclaim, because "'[p]romissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue.'"[20] And if the contract were found to be void *ab initio*, the court reasoned, *Price Dawe* would prohibit the court from enforcing the contract through the promissory-estoppel counterclaim.[21]

The Superior Court granted the motion to strike the affirmative defense of waiver and estoppel for the same reason that it dismissed the promissory-estoppel counterclaim.[22] It also dismissed the affirmative defenses of laches and unclean hands, holding that it lacked jurisdiction to consider those defenses because they were "equitable claims [that] are reserved for the Court of Chancery."[23]

D

Following discovery, the parties filed cross-motions for summary judgment. Sun Life asserted that the policies were investor-originated STOLI policies that lacked an insurable interest because they were procured by LPC. It therefore argued

---

[20] *Id.* at *3 & n.19 (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013)).
[21] *Id.* at *3.
[22] *Id.*
[23] *Id.*

11

that Wilmington Trust was not entitled to receive the death benefits under any theory. Sun Life also argued that Wilmington Trust was not entitled, as a matter of Delaware's unjust-enrichment law, to a "return" of premiums that it did not itself pay. Wilmington Trust argued that the policies were valid, non-STOLI policies, and Sun Life was thus obligated to pay the death benefit. It argued in the alternative, that, if the policies were not valid, it was entitled to a refund of all premiums that had been paid over the life of the policies (including by prior owners of the policies), based either on an automatic-refund rule or as restitution in accordance with Section 198 of the Restatement (Second) of Contracts.

The Superior Court found that both policies were procured by LPC and were therefore STOLI policies that lacked an insurable interest.[24] Consequently, the court held that the policies were void *ab initio*.[25] Wilmington Trust has not appealed that aspect of the Superior Court's ruling.[26] The combined effect of the court's determination that the policies were void *ab initio* and the court's earlier rejection of Wilmington Trust's promissory-estoppel counterclaim and its equitable defenses

---

[24] *Sun Life Assurance Co. of Canada v. Wilmington Trust, Nat'l Ass'n*, 2022 WL 179008, at *11 (Del. Super. Ct. Jan. 12, 2022).

[25] *Id.*

[26] The Superior Court also rejected Wilmington Trust's counterclaims alleging that Sun Life had engaged in unfair and deceptive trade practices under Massachusetts law and that Sun Life breached the implied covenant of good faith and fair dealing. *Id.* at *11–12. Wilmington Trust has not appealed those rulings either.

was to deny Wilmington Trust's attempt to recover the death benefits under the policies.

Addressing Wilmington Trust's claim that it was entitled to recover the premiums paid on the policies, the Superior Court wrote:

> As a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for premiums. It also appears unfair for investors to be reimbursed for premiums if they knew that they were inducing STOLI policies.
>
> . . . .
>
> The Court finds that Sun Life cannot be absolved from any obligation to pay death benefits *and* yet retain premiums. Thus, Sun Life must disgorge premiums. The question remains: to whom should the premiums be given?
>
> The Court finds that Wilmington Trust's predecessors knew that they were inducing insureds to procure STOLI policies through substantial inducements. Wilmington Trust's predecessor used intermediaries to consummate pre-negotiated agreements and arrangements.
>
> There is an absence of statutory, regulatory, or legal authority directly applicable to these facts. The Court holds that premiums must be reimbursed to the party that paid them. The Court finds no reason for that reimbursement to include pre-judgement [sic] interest.[27]

The court later entered a final order and judgment that required Sun Life to pay specified amounts to the respective entities that had paid premiums in those amounts during the times that they owned the policies. Specifically, the Superior Court ordered Sun Life to pay (i) $1,171,400 and $693,979 to LPC Holdings I LP

---

[27] *Id.* at *13–14.

13

for premiums that LPC Holdings paid on the De Bourbon and Frankel policies, respectively; (ii) $317,340 and $118,672 to Villa Capital, LLC for premiums that Villa Capital paid on the De Bourbon and Frankel policies, respectively; (iii) $1,737,818.37 and $510,903 to ESF QIF Trust for premiums that ESF QIF Trust paid on the De Bourbon and Frankel policies, respectively; and (iv) $1,518,922.11 and $806,433.96 to Wilmington Trust for premiums that Wilmington Trust paid on the De Bourbon and Frankel policies, respectively.

E

On appeal, Wilmington Trust challenges the Superior Court's dismissal of its promissory-estoppel claims and equitable defenses and the consequent denial of Wilmington Trust's death-benefit claim.  As it did below, Wilmington Trust also argues that, if it is not to receive the death benefits under the policies, then it should recover all premiums paid over the life of the policies, including the premiums paid by prior owners of the policies, with prejudgment interest.

Sun Life responds that the Superior Court was correct in rejecting Wilmington Trust's claims to the death benefits under the policies, be they fashioned as claims or defenses.  And as for the disposition of premiums paid over the life of the policies, Sun Life cross-appeals, contending that the Superior Court applied the wrong standard to the question of premium return.  Because Wilmington Trust's purchase

14

of the policies was, according to Sun Life, "a knowing STOLI investment,"[28] awarding restitution of the premiums to Wilmington Trust would frustrate Delaware's public policy against human-life wagering.  Sun Life thus claims that it is entitled to retain the premiums.

## II

This Court reviews questions of law *de novo*.  The Court reviews a trial court's decision to grant a motion to dismiss under Superior Court Rule 12(b)(6) *de novo*.[29]  Where, as here, a trial court's decision to strike an affirmative defense decides a question of law, this Court also applies a *de novo* standard of review.[30]

This Court reviews "a trial court decision on cross-motions for summary judgment *de novo* 'both as to the facts and the law to determine whether or not the undisputed material facts entitle [either] movant to judgment as a matter of law.'"[31]  "If material issues of fact exist or if a court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate."[32]  "In evaluating the record on a motion for summary judgment, a

---

[28] Answering Br. at 8.

[29] *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

[30] *See Gen. Motors Corp. v. Wolhar*, 686 A.2d 170, 172 (Del. 1996) (stating that Superior Court's decision to strike an affirmative defense decided a question of law and that "[t]herefore, the applicable standard of review is *de novo* or plenary").

[31] *Reserves Mgmt. Corp. v. R.T. Properties, LLC*, 80 A.3d 952, 955 (Del. 2013) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 535 (Del. 1996)) (alteration in original) (citation omitted).

[32] *Motorola, Inc. v. Amkor Tech., Inc.*, 849 A.2d 931, 935 (Del. 2004).

15

trial judge is not permitted to weigh the evidence or resolve conflicts presented by the pretrial discovery."[33] "The trier of fact may weigh the evidence and resolve disputes only after hearing all the evidence, including live witness testimony."[34]

### III

### A

Wilmington Trust asserts that, even if a policy is void *ab initio*, a policy owner can assert promissory estoppel or equitable defenses as grounds to recover the death benefit. Thus, it argues that the Superior Court erred by dismissing its promissory-estoppel counterclaim and by striking its equitable defenses of laches, waiver and estoppel, and unclean hands. Accordingly, Wilmington Trust asks us to reverse this dismissal and remand the matter to the Superior Court so that it can decide whether Sun Life must pay $19 million in death benefits based on Wilmington Trust's promissory-estoppel counterclaim or its equitable defenses. Sun Life contends that none of Wilmington Trust's counterclaims or defenses entitles it to receive the policies' death benefits.

Wilmington Trust's claim that it is entitled to recover the death benefits turns on its claim that, several years after Sun Life issued the policies, Sun Life began to suspect that the policies might be STOLI because of their association with LPC but

---

[33] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).
[34] *Id*.

did not seek to invalidate the policies until the insureds died. Wilmington Trust complains that, instead of informing Wilmington Trust and the policies' prior owners about its suspicions, Sun Life approved three separate ownership/beneficiary changes, repeatedly represented that the policies were "in force" and "active," and continued collecting millions of dollars in premiums on the policies. It argues that this Court should endorse the reasoning of courts in various jurisdictions, including the District of Delaware, to the effect that courts may afford relief to the more innocent party to a contract that is against public policy.

We agree with the Superior Court's conclusion that Wilmington Trust is not entitled to recover the death benefits on the policies, whether under its counterclaim for promissory estoppel or its affirmative defenses. The Superior Court determined that the policies were investor-procured STOLI policies, and Wilmington Trust does not contest that ruling on appeal. As we recently stated, "the insurance company is not obligated to pay the death benefit of a STOLI policy and may refuse to do so."[35] And our recent decisions have been crystal clear that Delaware courts will never enforce such a policy. Harkening back to *Price Dawe*, we emphasized in *Estate of*

---

[35] *Estate of Malkin*, 278 A.3d at 60. Indeed, an order requiring an insurer to pay the death benefit to an investor-holder of a STOLI policy might well give rise to a claim by the insureds' estate to recover the death benefit. *See* 18 *Del. C.* § 2704(b) ("If the beneficiary, assignee or other payee under any contract made in violation of [the insurable interest requirement] receives from the insurer any benefits thereunder accruing upon the death . . . of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.").

17

*Malkin* that "STOLI policies are void *ab initio*, never come into legal existence, are a 'fraud on the court,' and *can never be enforced*."[36] And shortly after that, we confirmed in *Seck* that the enforcement of an illegal contract is antithetical to the public policy of this State.[37] In fact, "when an agreement is void *ab initio* as against public policy, the courts typically will not enforce a remedy to any extent against either party."[38]

But a court order requiring Sun Life to pay the policies' death benefits to Wilmington Trust would, in effect, enforce the illegal STOLI policies in violation of Article II, Section 17 of the Delaware Constitution and the State's strong public policy against human-life wagering.[39] Such a remedy would fly in the face of our repeated avowals that enforcement of a STOLI policy is not an option. Thus, the Superior Court did not err by dismissing Wilmington Trust's promissory-estoppel counterclaim and striking its equitable defenses to the extent that they sought recovery of the policies' death benefits.[40]

---

[36] *Estate of Malkin*, 278 A.3d at 56 (quoting *Price Dawe*, 28 A.3d. at 1069 n.25, 1073) (emphasis added).

[37] *Seck*, 284 A.3d at 61.

[38] *Id.*

[39] *See Estate of Malkin*, 278 A.3d at 65 (When an investor receives the proceeds of a STOLI policy, it "commit[s] . . . a violation of Article II, Section 17 of the Delaware Constitution and of the State's public policy" against human-life wagering.).

[40] *See Columbus Life Ins. Co. v. Wilmington Trust Co.*, 2021 WL 3886370, at *7 (D. Del. Aug. 31, 2021) ("[U]nder the reasoning of *Price Dawe*, Wilmington Trust's challenged affirmative defenses, which seek to enforce the Policy should it be deemed void *ab initio*, are impermissible as they seek relief that the Delaware Supreme Court says courts cannot give.").

This conclusion is consistent with several federal court decisions applying Delaware law and holding that an investor may not assert equitable defenses or a promissory-estoppel counterclaim to recover the death benefit on a STOLI policy.[41] As the Delaware District Court has put it, if the promise that Wilmington Trust seeks to enforce is Sun Life's "promise in the life insurance contract that it [would] pay a [$19] million death benefit upon [the insureds'] death, the Court cannot enforce that promise" because "a promise in a contract that is void *ab initio* 'may never' be enforced by the Court."[42] And if the promise that Wilmington Trust is seeking to enforce is a "subsequent 'promise to comply with its promise to pay the . . . death benefit[s] when [the insureds] die[d]' so long as [Wilmington Trust] continued making premium payments," then that promise "would itself constitute an unenforceable, illegal wager on the life of [the insureds]," which the courts may never enforce.[43]

---

[41] *See, e.g.*, *id.* (dismissing promissory-estoppel counterclaim and striking affirmative defenses); *Wilmington Savs. Fund Soc'y, FSB v. PHL Variable Ins. Co.*, 2014 WL 1389974, at *12 (D. Del. Apr. 9, 2014) (A STOLI policy "may not be enforced equitably through estoppel[.]"); *U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 2017 WL 347449, *2 (E.D.N.Y. Jan. 24, 2017) (dismissing affirmative defenses as a matter of law).

[42] *Columbus Life Ins. Co. v. Wells Fargo Bank*, 2021 WL 106919, at *9 (D. Del. Jan. 12, 2021) ("*Snyder*") (R. & R.) (quoting *Price Dawe*, 28 A.3d at 1067).

[43] *Id.*

Wilmington Trust urges this Court to instead adopt the reasoning applied in two District of Delaware decisions, one known as *Griggs*[44] and the other as *Sol II*.[45] Neither of those decisions persuades us to allow Wilmington Trust to recover the policies' death benefits under its promissory-estoppel and equitable theories.

In *Griggs*, an insurer filed a declaratory judgment action seeking to declare a $10 million life insurance policy void *ab initio* as STOLI.[46] The policy owner asserted various counterclaims, including promissory estoppel and a claim for a declaratory judgment that the insurer was estopped from challenging the policy or had waived its right to challenge the policy. The court denied the insurer's motion to dismiss the counterclaims. It held that the policy owner had adequately alleged that the insurer had acted in bad faith, "including by collecting hefty premiums while harboring an undisclosed plan to challenge the policies and never pay claims on them[.]"[47] The court similarly held that the policy owner had adequately pleaded a counterclaim for promissory estoppel.[48] The *Griggs* court was careful, however, to qualify these holdings; it explicitly noted that it was not determining whether the policies were illegal and whether enforcement of them would be against public

---

[44] *PHL Variable Ins. Co. v. ESF QIF Trust ex rel Deutsche Bank Trust Co.*, 2013 WL 6869803 (D. Del. Dec. 30, 2013) ("Griggs").

[45] *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2019 WL 2151695 (D. Del. May 17, 2019) ("Sol II").

[46] *Id.* at *1.

[47] *Id.* at *6.

[48] *Id.* at *8.

policy. Seen in this light, the court's refusal to dismiss the policy owner's bad-faith and promissory-estoppel claims is drained of its relevance here.

By contrast, in *Sol II*, the court had previously declared that a life insurance policy was STOLI and void *ab initio*.[49] The insurer, Sun Life, then moved for summary judgment on the counterclaims brought by the downstream policy owner, U.S. Bank, including a promissory-estoppel claim. The court denied the motion, reasoning that it was "not enforcing a void [p]olicy, but [was], instead, estopping an allegedly bad faith actor who made promises in connection with the [p]olicy from escaping the just consequences of such promises."[50] But although the *Sol* court allowed the promissory-estoppel claim to proceed to trial, it ultimately rejected U.S. Bank's claim for expectation damages in the amount of the death benefit.[51] In a post-trial decision following "a six-day jury trial that resulted in a verdict in favor of U.S. Bank . . . on its promissory estoppel counterclaim," the court held that U.S. Bank would be awarded restitution damages equal to the total amount of premiums

---

[49] *See Sol II*, 2019 WL 2151695, at *2 n.2 (noting that the court held in an earlier summary judgment opinion that the policy "was void *ab initio* as an illegal wagering contract") (citing *Sun Life Assurance Co. Canada v. U.S. Bank Nat'l Ass'n*, 369 F. Supp 3d 601, 617 (D. Del. 2019)).

[50] *Sol II*, 2019 WL 2151695, at *8 n.8.

[51] The court reasoned that Delaware courts award expectation damages in the promissory-estoppel context only in exceptional circumstances, noting that the "more routine role of promissory estoppel [is] to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive[] recompense for that harm." *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2019 WL 8353393, at *1, 3 (D. Del. Dec. 30, 2019) (quoting *Ramone v. Lang*, 2006 WL 905347, at *14–15 (Del. Ch. Apr. 3, 2006)).

paid to Sun Life on the policy at issue.[52] After determining that "both sides are to blame for the situation in which they find themselves" and that U.S. Bank had not shown bad faith by Sun Life or other "unusual circumstances," the court limited U.S. Bank's damages to restitution of premiums.[53]

Thus, in neither of the cases from the District of Delaware upon which Wilmington Trust principally relies did the court permit the owner to recover a STOLI policy's death benefit. And we are not inclined to do so here. As previously noted, to award the death benefit to Wilmington Trust would be to, in effect, enforce the STOLI policies, causing the illegal human-life wagers to pay off. The Superior Court correctly averted that result by dismissing Wilmington Trust's promissory-estoppel counterclaim and striking its equitable affirmative defenses, the ultimate objective of which was the recovery of the death benefits under the policies. In light of this holding, we turn next to Wilmington Trust's claim that Sun Life should be ordered to repay all premiums paid under the policy, including those paid by its predecessors in interest, to Wilmington Trust.

IV

We noted earlier that in *Seck*, decided several months *after* the Superior Court decided this case, we held that a trial court should be guided by the Restatement's

---

[52] *Id.*
[53] *Id.* at *3–4. The court also awarded prejudgment interest.

22

fault-based analysis when determining whether, and to what extent, premiums should be returned when an insurance policy is found to be void *ab initio*. In this case, without the benefit of that opinion, the Superior Court applied an automatic premium-return rule, which we rejected in *Seck*, and ordered Sun Life to return premiums to each entity that paid them. Because of the conflict between the Superior Court's analysis and our decision in *Seck*, we reverse the court's judgment that Sun Life must reimburse all premiums "to the party that paid them."[54] But this, of course, does not mean that Sun Life is automatically entitled to retain the premiums. The question remains: To what extent, if any, is Wilmington Trust entitled to the return of premiums it and others before it paid? To that question we now turn.

### A

In the initial round of briefing, Wilmington Trust argued that an insurer must automatically disgorge all premiums that it received on a policy since inception if the policy is declared void, but that the Superior Court erred by ordering Sun Life to return the premiums to the owners that paid them, rather than requiring that Sun Life return all the premiums to Wilmington Trust. In its supplemental briefing following this Court's decision in *Seck*, Wilmington Trust submits that the Court should remand to the Superior Court to apply the "fact-intensive," "comparative fault-based analysis" adopted by *Seck*. Wilmington Trust argues that Sun Life should not be

---

[54] 2022 WL 179008, at *14.

23

permitted to retain any of the premiums paid on the De Bourbon and Frankel policies because Sun Life suspected that the policies were STOLI five years before Wilmington Trust acquired the policies (and had inquiry notice of the nature of the policies ten years before Wilmington Trust acquired the policies). But instead of attempting to rescind the policies, Wilmington Trust argues, Sun Life continued to collect premiums; represented that the policies were "active," "in force," and "in good standing;" and approved three ownership/beneficiary changes, including the one corresponding to Wilmington Trust's acquisition of the policies.

Sun Life acknowledges that "[t]his Court's decision in [*Seck*] governs the premium refund question here" but argues that Wilmington Trust's attempt to obtain a premium refund should end here because Wilmington Trust did "not plead unjust enrichment nor did its promissory estoppel claim seek a premium refund."[55] We disagree; Wilmington Trust should be permitted to pursue restitution of the premiums on remand.

As an initial matter, Wilmington Trust's answers and counterclaims made clear that it was seeking, as an alternative to the death benefits, return of all premiums paid to Sun Life over the life of the policies. It also made clear, with detailed supporting factual allegations, its position that Sun Life should not be permitted to keep the premiums because it formed an intent to challenge the policies

---

[55] Sun Life Opening Suppl. Br. at 1–2.

as STOLI but engaged in conduct designed to induce the policy holders to continue paying millions of dollars in premiums. Moreover, Wilmington Trust argued in its summary-judgment briefing that it was entitled to a restitutionary return of premiums under the Restatement because Sun Life was more in the wrong than Wilmington Trust/Viva.[56]

Because the parties actually litigated the restitution issue, and because this Court clarified the applicable test for a restitutionary return of premiums after the Superior Court had issued its decision in this matter, Wilmington Trust should be permitted to proceed with its claim for recovery of the premiums.

B

As mentioned above, in *Seck* we held that claims such as Wilmington Trust's premium-return claim should be subjected to a fault-based analysis as framed under the Restatement (Second) of Contracts. Writing for the Court, Justice Montgomery-Reeves explained how the analysis should proceed:

> [W]hen analyzing a viable legal theory that seeks as a remedy the return of premiums paid on insurance policies declared void *ab initio* for lack of an insurable interest, Delaware courts shall analyze the exceptions outlined in Section 197, 198, and 199 of the Restatement and determine whether any of those exceptions permit the return of the premiums. A court would need to determine whether: (1) there would be a disproportionate forfeiture if the premiums are not returned; (2) the claimant is excusably ignorant; (3) the parties are not equally at fault; (4) the party seeking restitution did not engage in serious misconduct and withdrew before the invalid nature of the policy becomes effective;

---

[56] *E.g.*, A525–26, A604–07, A650–60.

25

or (5) the party seeking restitution did not engage in serious misconduct, and restitution would put an end to the situation that is contrary to the public interest.

A court analyzing the exceptions outlined in Section 198 should consider the following questions: whether the party knew the policy was void at purchase or later learned the policy was void; whether the party had knowledge of facts tending to suggest that the policy is void; whether the party procured the illegal policy; whether the party failed to notice red flags; and whether the investor's expertise in the industry should have caused him to know or suspect that there was a substantial risk that the policy it purchased was void.

Thus, the fault of the parties and public policy considerations will determine which party is entitled to the premiums paid on an insurance policy that is void *ab initio* for lack of an insurable interest.[57]

The inquiries mandated by this analysis are manifestly fact-intensive. But because the Superior Court applied an automatic-refund rule, it did not make any factual findings—or, more precisely in light of the summary-judgment posture, it did not evaluate whether there were any disputed issues of material fact—regarding whether and when the parties had actual knowledge or inquiry notice of the policies' illegality, whether the parties were equally at fault, or any of the other considerations that this Court identified in *Seck* as relevant to the fault-based analysis.

Determining whether Sun Life should retain the premiums or Wilmington Trust should recover some or all of them under *Seck* will require a fact-intensive analysis and require the weighing of evidence. The Superior Court should conduct

---

[57] *Id.* at 72–73.

26

that analysis in the first instance.[58] Indeed, in *Seck*, the Court remanded for the Superior Court to "review its [post-trial] factual findings through the lens of our newly articulated fault-based test."[59] Here, the Superior Court made *no* factual findings relating to the fault-based test.

## C

That leaves the question whether Wilmington Trust can recover premiums paid by the former owners of the policies between 2006 and 2014 (or, put conversely, whether Sun Life can retain premiums paid by the entities that held the policies before Wilmington Trust acquired them on Viva's behalf in 2014). Wilmington Trust does not dispute that at least two of the three former owners of the policies— LPC Holdings I LP and Villa Capital—were affiliated with LPC.[60] We note that the Superior Court concluded that LPC procured the policies under a STOLI scheme that it created. Whether Wilmington Trust can prove that all or some of the former owners were less at fault than Sun Life is for the Superior Court to determine.

---

[58] *See Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) ("In evaluating the record on a motion for summary judgment, a trial judge is not permitted to weigh the evidence or resolve conflicts presented by the pretrial discovery."); *see also id.* ("The trier of fact may weigh the evidence and resolve disputes only after hearing all the evidence, including live witness testimony.").

[59] *Seck*, 284 A.3d at 74–75.

[60] *See* Opening Br. at 8 (stating that LPC acquired the policies shortly after their inception); *id.* at 17 (describing Villa Capital as an "LPC-affiliate"). Sun Life asserts that ESF QIF Trust was also an LPC-affiliated entity, *e.g.*, Sun Life Answering Br. at 3, and Wilmington Trust does not appear to dispute that fact. Indeed, Wilmington Trust points to Sun Life's knowledge of ESF QIF Trust's association with the individuals who carried out the LPC STOLI scheme in support of its assertions of Sun Life's fault. *E.g.*, Wilmington Trust Opening Br. at 21.

27

Finally, Wilmington Trust suggests in its supplemental briefing that Sun Life is arguing, based on *Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.* ("*Corwell*"),[61] that Wilmington Trust does not have standing to litigate a return of premiums paid on behalf of its principal, Viva. In *Corwell*, which was decided under Illinois law, the Seventh Circuit Court of Appeals expressed doubt about whether the securities intermediary could claim a refund on behalf of the principal.[62] But we do not read that to be Sun Life's argument. Rather, Sun Life points to *Corwell* in support of its arguments that (1) Wilmington Trust cannot recover premiums paid by former owners of the policies, especially where those former owners were the STOLI perpetrators, and (2) Wilmington Trust cannot recover premiums because Viva was a highly sophisticated buyer that was fully aware of all the material facts and the significant insurable-interest risk in the policies that it purchased but took a calculated risk to try to profit from the policies by buying them at a discount and trying to cash in at the insureds' death.[63] In any event, we are not inclined to address *Corwell*'s significance, if any, in this appeal. *Corwell*, like *Seck*, was decided after the Superior Court decided this case. Whether *Corwell* and its

---

[61] 44 F.4th 1024 (7th Cir. 2022).

[62] *See id.* at 1040 ("First, Wells Fargo has not offered evidence or argument to establish its right to collect this refund if it were otherwise appropriate. Vida itself is not a party to this case and has not asserted a right to such a refund.").

[63] *Id.*

reasoning present persuasive reasons for denying Wilmington Trust premium-return claim is for the Superior Court to decide in the first instance on remand.

D

Wilmington Trust also contends that the Superior Court erred by denying Wilmington Trust an award of prejudgment interest. It argues that Sun Life should be required to pay prejudgment interest from the date of each premium payment. Sun Life argues, as an initial matter, that no prejudgment interest is due because the Superior Court erred by ordering it to refund the premiums. But it also contends that, even if this Court affirms the Superior Court's decision regarding premiums, it should also affirm the court's decision not to award prejudgment interest. According to Sun Life, prejudgment interest does not begin to accrue until a payment is "due"— in the case of a refund, when the claimant makes a demand for the refund—and no refund was due here until, at the earliest, the Superior Court determined that the policies were void *ab initio*.

In *Seck*, we recognized the role prejudgment interest plays in incentivizing the parties to potentially illegal agreements to behave in good faith.[64] Moreover, "[i]n

---

[64] *See Seck*, 284 A.3d at 72 ("A fault-based analysis also incentivizes insurers to speak up when the circumstances suggest that a policy is void for lack of an insurable interest because they will not be able to retain premiums if they stay silent after being put on inquiry notice, and they might also be responsible for interest payments. In other words, our test incentivizes each player along the chain of these insurance policies to behave in good faith."). Of course, the prospect of prejudgment interest can also affect the policy holders' calculations. *See* Sun Life Answering Suppl. Br. at 18 (discussing "a pair of STOLI cases pending in the District of Delaware, [in which] Viva has conceded that the at-issues policies are STOLI and—instead of seeking the $10 million

29

Delaware, prejudgment interest is awarded as a matter of right."[65]  Thus, an award

of prejudgment interest is warranted if Wilmington Trust prevails on its refund

claim.  The question is when it should begin to accrue.

"As a general rule, interest accumulates from the date payment was due to a

party."[66]  When the obligation to make a payment arises from a contract, the court

will look to the contract itself to determine when interest should begin to accrue.[67]

"For insurance claims, interest accumulates from the date a party actually demands

payment.  Where it is difficult to determine to a reasonable degree of certainty when

an insured demanded payment, we often rely on the date that the insured filed the

complaint."[68]  In *Moskowitz v. Mayor & Council of Wilmington*, where a property

owner made a claim for a refund of a tax payment that the property owner asserted

was improperly assessed, this Court held that interest should be awarded "from the

date the taxpayer gave notice to the governmental entity that the taxpayer considered

---

death benefit—is arguing that it is entitled to a 'premium refund' of *over $16 million*, which it calculates by applying prejudgment interest to its alleged entitlement to all of the premiums the insurer ever received (including the millions Viva did not pay")).

[65] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citing *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209 (Del. 1978)).

[66] *Stonewall Ins. Co v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1262 (Del. 2010) (citing *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 507–08 (Del. 2001).  *See also Citadel Holding*, 603 A.2d at 826 ("Such interest is to be computed from the date payment is due.") (citing *Moskowitz*, 391 A.2d at 210)).

[67] *Citadel Holding*, 603 A.2d at 826 (citing *Watkins v. Beatrice Companies, Inc.*, 560 A.2d 1016, 1020 (Del. 1989)).  In *Citadel Holding*, the Court held that a plaintiff who was entitled to reimbursement of legal expenses under an indemnification agreement was entitled to prejudgment interest computed from the date that the plaintiff demanded reimbursement and produced his written promise to repay as required under the agreement.  *Id.* at 826 & n.10.

[68] *Stonewall*, 996 A.2d at 1262 (citation omitted).

the tax payment unlawful or improper."[69] "The rationale underlying this rule is that money is not due and payable, and thus not in default, until there has been a demand therefor."[70] "Thus, a taxpayer may recover interest from the date the tax payment was made if the payment was accompanied by adequate notice that the payment is considered to be excessive, improper, or unlawful; but if such notice did not accompany the tax payment then interest will not begin to accumulate until there has been a later act constituting notice to the taxing authority that, in the opinion of the taxpayer, the tax is excessive, improper, or illegal."[71]

Applying these principles to the circumstances of this case, Wilmington Trust is not entitled to prejudgment interest predating its purchase of the policies in 2014. Weighing the incentivizing effects of prejudgment interest on insurers and STOLI policy holders, Sun Life should not be responsible for—and Wilmington Trust should not receive—interest on premiums paid by LPC affiliates. If the Superior Court ultimately determines that Wilmington Trust is entitled to restitution of any of the premiums that it paid, the court should award prejudgment interest from the date that Wilmington Trust asserted that a premium refund was due—which likely corresponds to the date that Wilmington Trust filed its answer and counterclaims.[72]

---

[69] *Moskowitz*, 391 A.2d at 211.

[70] *Id.*

[71] *Id.*

[72] *Cf. Stonewall*, 996 A.2d at 1262 ("We disagree with the chosen accrual date. Prejudgment interest is an extraordinary award that applies when a party unjustifiably refuses to live up to its obligation after payment is due. Although DuPont's initial 1999 complaint may in the abstract be

31

**V**

The Superior Court properly dismissed Wilmington Trust's promissory-estoppel counterclaim and struck its equitable defenses thereby defeating Wilmington Trust's claim for the recovery of death benefits under the two STOLI policies. The court's application of an "automatic premium refund" rule clashes with this Court's subsequent rejection of that rule in favor of the Restatement's fault-based analysis. The court also erred by ruling that, to the extent that any premium payments are recoverable, prejudgment interest was not available. For these and the other reasons stated above, the judgment of the Superior Court is AFFIRMED in part and REVERSED in part. The case is REMANDED to the Superior Court for further proceedings in accordance with this opinion.

---

construed as a demand for payment, DuPont amended that complaint to make demand against the 1983 insurers. After settling with the 1983 insurers, DuPont then changed its strategy and made claims against the 1985 insurers, including Stonewall, in an August 4, 2006 demand letter. Therefore, Stonewall could not have unjustifiably refused to pay until DuPont demanded payment on August 4, 2006. Accordingly, the motion judge erred by awarding prejudgment interest from December 30, 1999.") (citation omitted).